1. The lien of the mechanic or material-man, under the statute, begins with the commencement of the work or furnishing material under his express or implied contract with his employer, and attaches upon whatever estate the latter may have at the commencement of such work or the furnishing materials, and is superior to all after-acquired liens and any prior liens or incumbrances of which the mechanic or material-man had no actual or constructive notice.
2. Courts do not enforce contracts between parties, the execution of which is legally impossible.
3. The rule of *caveat emptor* applies against a mechanic as well as in the case of a vendee.
4. If a contractor proposes to erect a building or to put labor or materials on a piece of ground, it behooves him to assure himself of the fact that the person with whom he contemplates making his contract, or for whose benefit he is about to employ means or labor, has such an interest or title unincumbered as will enable him to avail himself of a valid lien.
5. Under our system of registration, if the mechanic or material-man fails to inform himself, the law will not relieve him against the consequences of his own negligence.

*Appeal from County Court of Arapahoe County.*

THE facts are stated in the opinion.

Messrs. MARKHAM and DILLON, for appellant.

Mr. I. E. BARNUM, for appellees.

MACON, C.   This action was commenced in September of 1882, by appellees Norton & La Due, on their demand for balance due them on their contract with Machen for the construction of a dwelling-house, and for the enforcement of their mechanic's lien asserted for the same against lots 7, 8, 9 and 10, in block 9, in Waddell & Machen's subdivision of Denver.   Machen and others were made parties defendants, appellant being the only contending defendant at the hearing of the cause.

In their complaint, plaintiffs alleged that on March. 15, 1882, Machen was owner of said lots 7, 8, 9 and 10;.

that on that date they entered into a contract in writing with him, whereby it was agreed that plaintiffs should construct for him a brick dwelling-house, with basement, etc., on said lots 9 and 10, for the sum of $3,500, payable $400 when first-story joists were on, $400 when second-story joists were on, $400 when brick work completed, $500 when house inclosed, $400 when ready for plastering, $400 when plastering completed, $500 when ready for painting, $500 when house completed; that the situation of the house was as directed by Machen; that on the 11th day of August, 1882, plaintiffs duly completed the same in accord with the terms of said contract, and besides did extra work thereon, to the amount of $100, at request of Machen; that $1,600 had been paid upon the contract, and the remainder, $1,900, thereon, and the $100 for the extra work, remained due and unpaid; also alleged all the necessary steps fixing the mechanic's lien to the said premises for this amount. Afterwards, on December 2, 1882, by leave of court, plaintiffs filed an amendment to their complaint, in which it was alleged that appellant Tritch had become interested in the premises by purchase since the commencement of the action, and while *lis pendens* was duly of record in the records of said county, containing full notice of the action, and its purposes, and asked an order that said Tritch be made party to the action, and that it might be decreed that whatever interest he might have in the premises be subject to the lien of plaintiffs. Whereupon Tritch came and answered, denied the allegations of the complaint, except those concerning *lis pendens* notice, and alleged as follows:

"But defendant says that the plaintiffs, in disregard and violation of a contract, which they had made with said Machen to build him a house on lots 9 and 10, where said Machen desired it, did, without the knowledge, consent or authority of said Machen, enter upon lots 7 and 8, and commence to do certain work upon and about the

erection of a building thereon, where said Machen did not desire such building, and that after said work had so progressed on said lots 7 and 8 to a considerable extent, just how far this defendant does not know and has not information sufficient to enable him to state, the said Machen discovered that the plaintiffs, in disregard and violation of their agreement and contract set out in the complaint herein, were erecting a building on lots 7 and 8 instead of lots 9 and 10, and thereupon the said Machen notified the plaintiffs thereof, and that the said building was not being located as in the contract provided and he desired.    Then the said Machen and the plaintiffs, as this defendant is informed and believes, made and entered into some sort of a new contract and agreement, not in writing, by which the plaintiffs were to be allowed to proceed to the completion of said building, which they had in violation of their said contract begun, on said lots 7 and 8, instead of lots 9 and 10 as aforesaid, it being understood and agreed that the said Machen should pay them therefor a certain sum in money, the exact amount this defendant does not know, and cannot state, and the remainder, amounting to one-half or more of the total cost thereof, the said Machen was to satisfy and pay, by conveying to plaintiffs certain lots in the said Waddell & Machen's addition, or elsewhere, the number, designation and location of which this defendant does not know and cannot state; that the written contract should and did then and thereby terminate, and was by mutual consent and by the action of the parties thereto canceled and set aside, except that probably the plans and specifications therein mentioned were to govern in the completion of the building under said new contract.

"And this defendant says that in order to enable himself to comply with this proposition of settlement, and enter into said new contract as aforesaid, and before the same was entered into, the said Machen was compelled to borrow the money to pay to plaintiffs, and that

this defendant did loan the said Machen the sum of $1,500 with which to make payment. For said sum of $1,500 the said Machen executed his certain promissory note, and also conveyed the said lots 7, 8, 9 and 10 to Job A. Cooper, trustee, with the sheriff of Arapahoe county, successor in trust for the use and security of this defendant as aforesaid. That by said conveyance, this defendant had and acquired a prior and superior lien upon the said lots 7, 8, 9 and 10; that the money loaned by this defendant to said Machen, and secured by said note and deed of trust as aforesaid, was paid to plaintiff, and fully met and paid off and satisfied any and all claims they had upon or against the said Machen on any account, up to the date thereof, and that the plaintiffs had full knowledge of the loan by this defendant Machen of the money aforesaid, and of the execution by said Machen of the said trust deed; and the said trust deed was, upon the 6th day of May, 1882, the day of its date, duly placed of record in the office of the recorder of Arapahoe county. Whatever work or labor was done, or material furnished, by the plaintiffs thereafter, was done and furnished with full knowledge and notice of the said trust deed, and that the same was a first, superior and prior lien upon the whole of said lots 7, 8, 9 and 10.

" This defendant, further answering, says that the said Machen did not make payment of said note, and the interest thereof, according to the terms and tenor thereof, and according to the stipulations and provisions of said trust deed, but did make default, and that thereupon this defendant, as he had a right to do, did cause and require the said sheriff of Arapahoe county, successor in trust as aforesaid, to advertise the said lots for sale to satisfy, pay off and discharge the said note, and the accrued interest thereon; and the said sheriff of Arapahoe county, successor in trust as aforesaid, did duly advertise the said lots 7, 8, 9 and 10 for sale, for the purposes aforesaid, as by law and by the terms of said trust deed he was re-

quired to do; and pursuant to said advertisement, and in accordance with the law in such cases made and provided, did, on the 27th day of September, A. D. 1882, at the front door of the court-house, on Lawrence street in the city of Denver, county of Arapahoe, state of Colorado, sell the said lots, with all the improvements thereon, to the highest bidder at public auction, and at said sale this defendant, being the highest and best bidder, became the purchaser of the same, for and at the price of $1,900, which satisfied his said debt as aforesaid, and left $242.50 over and above the amount of principal and interest and costs thereof, which said balance this defendant paid to the sheriff of Arapahoe county as successor in trust as aforesaid, and the said sheriff, as such successor in trust, executed and delivered to this defendant his deed, whereby the said lots 7, 8, 9 and 10, as set out in the complaint herein, were conveyed to and became the property of the defendant.

"By reason of all which this defendant became and is the sole owner of the said lots, and each and all of them, and the improvements thereon, and defendant denies that the plaintiffs have any claim against or any lien upon the same, or any part thereof, on account of the matters and things set out in their complaint and amended complaint; and says that any lien, or pretended lien, of plaintiffs, acquired or sought to be acquired upon the same, by and in virtue of the notices, or pretended notices, to said Machen, as set out in the complaint, was, if valid for any purpose, subsequent and inferior to the lien of this defendant as hereinbefore set forth; and that the lien of this defendant aforesaid having been foreclosed, and the said lots conveyed to him pursuant to law, this defendant prays that so much of the complaint of plaintiffs as seeks to subject said lots, or any part thereof, to any claim, or pretended claims, of plaintiffs against the said Machen, be disallowed and dismissed; and prays

that he be quieted in his title and possession of the said premises, and for his costs and all proper relief."

To which plaintiffs replied as follows:

### "REPLICATION OF GEORGE TRITCH.

"The plaintiffs reply: (1) That they deny that they did work or furnished any material and did construct said house in part on said lots seven (7) and eight (8) without any direction from said Machen so to do, and they deny the allegation that said work and labor was performed, and said material furnished, as aforesaid, without any contract with said Machen so to do. (2) They deny that, in violation and disregard of the contract which they had made with said Machen to build him a house on lots 9 and 10, where said Machen desired it, they did, without the knowledge or consent or authority of said Machen, enter upon lots seven (7) and eight (8) and commenced to do certain work upon and about the erection of a building thereon where said Machen did not desire said building; and they deny that after said work had so progressed to a considerable extent on said lots seven (7) and eight (8) that said Machen discovered that the plaintiffs, in disregard and violation of their agreement and contract, which agreement is set out in said complaint, were erecting a building on lots 7 and 8, instead of lots 9 and 10; and they deny that, thereupon, he notified them thereof, and that said building was not being located as the contract required and as he desired; but they admit that when he discovered his own mistake in the lots as set out in the complaint, that he did notify them that he had made a mistake in the location of the building; and they deny that when said Machen discovered that a mistake had been made in the location of the house, that a new contract, not in writing or in any form, was made, by which the plaintiffs were to be allowed to proceed to the completion of said house, which, as alleged in said answer,

they, in violation of that contract, had begun on lots 7 and 8, instead of lots 9 and 10; and they deny that it was understood or agreed that the said Machen should pay them therefor a certain sum of money, and that the remainder, amounting to one-half or more of the total cost thereof, the said Machen was to satisfy and pay by conveying to plaintiffs certain lots in the said Waddell & Machen's addition or anywhere else; and they deny that it was agreed that the written contract should or did thereby terminate, and deny that it was by the mutual consent and by the action of the parties thereto canceled and set aside in any regard whatever; and they deny that, in order to comply with any such proposition of settlement, and to enter into said new contract, and before the same was entered into, said Machen was compelled to borrow money to pay said plaintiffs; but they admit that he did pay them some money about the time he discovered his said mistake; but these plaintiffs do not know where he got the same, and leave said defendant to his proof thereof; and they admit that said Machen did give his promissory note to said Tritch, secured by a trust deed on lots 7, 8, 9 and 10, substantially as set forth in said answer; but they deny that said trust deed created or became a lien on said lots, or any of them, prior to the mechanic's lien of these plaintiffs thereon; and they say said trust deed, and its lien and its rights, in connection therewith, are subsequent to and subject to the lien of these plaintiffs on said lots; and they say that, before the completion of said building, and before the filing of said notices, and before the institution of this suit, said Tritch had sold and disposed of said note, given by said Machen to one or both of said McIntyres, who are defendants herein, and he had no interest whatever in said note or said lots at the time of instituting this suit; and they say that said trust deed was not foreclosed under the directions of said Tritch, as the holder of said note, but was foreclosed under the direction of one or both of said

McIntyres, and that said Tritch became the purchaser at said sale, with the full knowledge of all the rights and claims of said plaintiffs in the premises, and was not an innocent purchaser thereof,— that he so purchased with full knowledge of this suit."

After which the following amendment to the complaint was made by consent: "And now come the said plaintiffs, by permission of the court, and in pursuance of the consent hereto annexed on the part of defendant, George Tritch, and file this amendment to the first paragraph of the second allegation, in the first cause of action, by striking out the words 'that on or about the 15th day of March, A. D. 1882, said defendant Edward C. Machen was the owner of said lots seven (7), eight (8), nine (9), and ten (10), in block 9,' inserting in the place thereof the following: 'That on or about the 15th day of March, A. D. 1882, said defendant Edward C. Machen was the owner of lots nine (9) and ten (10), and about the 6th day of May following he became the owner of lots (7) and eight (8), all of block 9.'"

At the hearing of the cause May 28, 1883, Tritch was the only contending defendant. Judgment for $2,000 was given against Machen, in favor of plaintiffs, and decreed a lien on said lots 7 and 8, and superior to the title of Tritch, with order of sale of the premises to satisfy the lien. Tritch moved for a new trial, which was denied, and he brings the cause here on appeal.

The evidence, as shown by the bill of exceptions, is as follows:

"Bill of exceptions as follows, to wit: Be it remembered that on, to wit, the 28th day of May, A. D. 1883, the said cause came on to be heard, as well on the issues joined between the plaintiffs herein and the defendant George Tritch, as upon the other issues in said cause, and the trial of said cause by a jury was waived, and the same was submitted to the court, and upon the trial of said issues the following facts were proven:

"(1) That upon the 15th day of March, A. D. 1882, a contract was entered into between the plaintiffs and the defendant Machen, for the erection of a brick dwelling-house upon lots 9 and 10, in block 9, in Waddell & Machen's addition to the city of Denver.

"(2) That the plaintiffs and defendant Machen, upon the 20th day of March, A. D. 1882, went to locate the ground upon which the building was to be erected (Machen not knowing the exact location of said lots 9 and 10), and with a tape line, held at one end by plaintiff Norton, and at the other end by defendant Machen, they measured off the ground, until defendant Machen believed he had located said lots 9 and 10, and the plaintiffs commenced the erection of the said dwelling-house on what plaintiffs and Machen believed was said lots 9 and 10, and by direction of said Machen.

"(3) That on or about the 25th day of March, plaintiffs commenced the erection of said brick dwelling by the excavation on said lots for a cellar or basement story for said dwelling, and by the erection of said dwelling, which was of brick and two stories in height, and with brick basement and foundation walls sunk into the earth, said dwelling being constructed as are ordinary brick dwellings in the city of Denver.

"(4) That the plaintiffs continued the erection of said dwelling until about the 4th day of May, A. D. 1882. At this last-mentioned date the said dwelling was constructed up to the second-story joists, and was ready for the roof. At this last-named date defendant Machen discovered that a mistake had been made in locating the lots upon which said dwelling was to be erected, and by said mistake the dwelling was being erected on lots 7 and 8 in said block, instead of upon said lots 9 and 10.

"(5) That the said Machen had no interest or title in or to said lots 7 and 8, either at the time the erection of the building was commenced or when said mistake was dis-

covered, but, on the contrary, they belonged to and the title was in one R. A. Long.

"(6) That upon discovering the mistake, the said Machen negotiated with the said Long for the sale and conveyance to him, Machen, of the said lots 7 and 8, and the price was agreed upon between Long and Machen for said lots.

"(7) And said Machen did not then have the money to purchase said lots 7 and 8, and he negotiated with the defendant George Tritch for the loan to him, Machen, by the said Tritch of the money with which to purchase the said lots 7 and 8, and the said Machen agreed with Tritch that if he would loan the money to purchase said lots, he would execute his note to said Tritch for the money loaned, and would execute his deed of trust upon said lots 7 and 8 to secure the payment of said note. The said Tritch agreed to this arrangement.

"(8) That to effect the purchase of lots 7 and 8, and to secure the money therefor by the loan as aforesaid, and to secure the payment of said loan by the execution of the deed of trust aforesaid, the defendant Machen and the said Long, owner of lots 7 and 8, and defendant Tritch, met together upon the 6th day of May, A. D. 1882, and thereupon said Long executed a deed of warranty, conveying to Machen said lots 7 and 8, and the said Tritch paid to said Machen the sum of $1,500, it being the said loan theretofore agreed upon. Said Machen thereupon executed his note to the said Tritch for the said $1,500, and executed and acknowledged a deed of trust, in the usual and ordinary form, conveying to Job A. Cooper said lots 7 and 8 as trustee, to secure the payment of said note for $1,500, and providing in said deed for the sale at public auction of said lots 7 and 8 at the request of the holder of said note, in the event of the non-payment of said note at maturity. The said deed of trust contained all the usual provisions as to notice, etc., and no objection is taken as to its sufficiency to effect

the objects of the trusts. Thereupon the said Machen paid said Long the purchase price of said lots, and Long delivered to Machen the deed for said lots, and Machen delivered to said Tritch said promissory note and deed of trust, and thereupon, and upon the same day, said warranty deed and deed of trust were filed for record in the recorder's office of Arapahoe county at the same identical period of time.

"(9) That the plaintiffs thereafter completed the erection of said dwelling-house, in the manner as provided in the said contract they should, and the same was completed upon the —— day of ——, 1882; that when said building was completed there was due the plaintiffs from said Machen upon the said building under the contract the sum of $1,900.

"(10) That within forty days from the completion of said building, the plaintiffs filed their notice of lien in the recorder's office of said county, in all things as set forth in the complaint, and they did commence this suit to foreclose this lien within six months from the filing of said notice of lien for record, and no objection is taken to the time of filing said lien or the sufficiency of notice, or to the time when said suit was commenced.

"(11) That subsequent to the execution of said several deeds, defendant Tritch assigned the said note for value to ——, and the said Machen wholly failed to pay said note at maturity. Upon such failure, the holders of the note ordered the trustee in said deed of trust to advertise and sell said lots 7 and 8, as provided in said deed of trust, to satisfy said note and interest, and the trustee did advertise said property as directed. That at the sale of said lots at the time fixed in the notice of sale, the defendant George Tritch became the purchaser, and he bid for said lots at said sale the sum of $1,800, which sum was duly paid to the trustee, to be disposed of by him under the trust.

"(12) The trustee in said deed of trust, upon the 27th

day of September, A. D. 1882, in pursuance of said sale and the powers conferred upon him by the deed of trust, executed and delivered to the defendant Tritch his deed of conveyance as such trustee of said lots 7 and 8, and by such deed he did convey, demise and quitclaim the said lots 7 and 8 unto the said George Tritch. No question is made as to the legality and sufficiency of the said sale and conveyance.

"(13) The said George Tritch did file said trustee's deed for record in the recorder's office in Arapahoe county, September 27, 1882.

"(14) At the time the said Machen discovered said mistake and received the conveyance of said lots 7 and 8, the plaintiffs had been paid in full the instalments due them under the contract. And the foregoing was all the evidence introduced in said trial, and were all the facts proven thereat. And thereupon, after argument by counsel, the court did find the issues joined as between the plaintiffs herein, and the said Geo. Tritch, in favor of the plaintiffs. Whereupon said defendant Tritch filed his motion for a new trial of said cause; which motion was overruled by the court, and the above decree rendered upon the findings, to which defendant below excepted and appealed to this court."

Seven errors are assigned by appellant as ground for reversal of the decree; all of which will be determined and disposed of by the decision of the second, which is that "the court erred in the adjudging and decreeing that appellees do have a lien on the real estate in controversy, and the structure thereon, and decreeing that appellant do hold his interests in said premises. and said structure subject to said lien."

The admitted facts in the record present three questions for solution: *First*, was the lien claimed by and decreed to appellees prior in time to the trust deed of appellant? *second*, if it was not, had appellees any equities in the case by which such trust deed should be post-

poned to their lien? and, *third*, if appellees cannot maintain a lien upon lots 7 and 8, as against appellant, can they upon the house situated upon lots 7 and 8?

The lien claimed by appellees depends for its validity upon the act of February 12, 1881, by which it is provided: "All persons performing work or labor, or furnishing materials, by contract, express or implied, with another, or his agent, to the amount of not less than $25, on or for any structure upon the land of that other, or in or to which that other has an interest, tenancy or claim of any sort whatever, shall have a lien upon such land and structure to the extent of such ownership, interest, claim or tenancy had at the time of the commencement of such work or labor or furnishing such materials, and a lien on such structure where the other has no ownership, interest, tenancy, or claim of, in or to such land, on complying with the terms of this act." "Sec. 3. It shall be the duty of the county clerk and recorder to record such statement in a separate book, provided for that purpose, and, from the time of such filing, the amount so stated shall become a lien on said land or structure, or both, to the extent of the ownership, interest, claim or tenancy as aforesaid of the title, subject, nevertheless, to adjudication as hereinafter set forth." "Sec. 11. So much land as may be occupied by any such structure as may be necessary for the convenient use and occupation of the same shall be subject to the liens hereinbefore provided for, and all such liens shall relate back to the commencement of work or labor, or of the furnishing of materials by the claimant, and shall have priority over any and every lien or incumbrance subsequently intervening, or which have been created prior thereto, but which was not then recorded, and of which the lienor under this act had no notice."

It is thus seen that the lien of the mechanic or material-man begins with the commencement of the work or furnishing material under his express or implied contract

with his employer, and attaches upon whatever estate the latter may have at the commencement of such work, or the furnishing materials, and is superior to all after-created liens, and any prior liens or·incumbrances of which the mechanic or material-man had no actual or constructive notice when his work began, or he began to furnish material.

In this case, Machen, the employer of appellees, had no title or estate of any sort in or to the two lots 7 and 8 when appellees commenced the erection of the house, nor any right or license from the owner thereof to go upon them for any purpose. The agreement between Machen and appellees was for building a house upon lots 9 and 10. That in all that was done by these parties in the construction of this house upon lots 7 and 8, prior to May 6, 1882, they were trespassers, cannot be denied, and upon a proposition so elementary the citation of authorities is unnecessary. It follows that no lien in favor of appellees could attach upon such *lots* while they remained the property of Long. But on May 4, 1882, Machen discovered the mistake in the location of the house, and informed appellees thereof, whereupon (it is proper to infer from the evidence) the work thereon was suspended, and was not again resumed until after Machen acquired the title to these lots on May 6, 1882.· At the same instant of time that Machen's title vested, appellant took his trust deed to secure the money advanced by him to Machen. Between the acquisition of title by Machen and the creation of appellant's incumbrance there was no interval of time which the law will recognize. Upon the conclusion of the negotiations by Machen for the purchase and conveyance to him of the premises in question, appellees proceeded to complete the unfinished building.

Upon ascertaining the mistake in the location of the building, it was the duty of appellees to desist from further work under the original agreement. Failing to

do so, they would have become wilful trespassers, and as such would not have been entitled to any benefit of the lien statute for improvements thereafter made. This conclusion is not affected by the fact that, under the last clause of section 1 above quoted, they might possibly, by proper proceedings, have secured a lien upon the building had anything been due for work and material furnished previous to the 4th of May.

It follows, therefore, that appellees must be held to have proceeded, after the 6th of May, under a new contract, express or implied. To the suggestion that, subsequent to this date, they acted, as far as possible, under the terms and conditions of the previous agreement, it is answered that, if such be the fact, that agreement must be regarded as then re-adopted, and that, for the purposes of this case, its existence dates from the time of such re-adoption. But it is doubtful if it can be truthfully said that after the 6th of May appellees proceeded, or could have proceeded, under the old contract. They were fully paid for all improvements made prior to the 4th of May. On that date they were apprised of the fact that they had been open trespassers upon lots 7 and 8. A fair inference from the evidence is that they then ceased work, as it was their duty to do, and did not resume until after the purchase by Machen. The agreement to complete an unfinished building on lots 7 and 8 varied in an important and material particular from the agreement to build a house on lots 9 and 10. Leaving out of view appellees' situation as wilful trespassers, had they continued work after May 4th, and before Machen's purchase, an action for the value of improvements thus made could hardly have rested upon the original contract. Courts do not enforce contracts between parties, the execution of which is legally impossible. They might, had they not been wilful trespassers, perhaps have recovered compensation for such improvements; but we are not prepared to say that they could have done so by a suit upon the old contract. It therefore results necessarily that the incum-

brance of appellant is prior in time to the lien of appellees, because the lien of the latter, if it exists, arises out of a contract subsequent in time to the execution of appellant's trust deed.

Then, are there any equities in favor of appellees which can or should postpone appellant's lien to theirs? Appellees' counsel in argument contend that such equities arise out of the fact, first, that appellant knew of the mistake as to the location of the house when he advanced his money with which Machen paid for the lots. Of this fact there is no proof, though the parties exhibit great care and caution in agreeing upon the conclusions of fact shown by evidence on the hearing of the case in the court below. But if counsel mean such notice existed on the part of Tritch, by reason of the rule that a vendee or an incumbrancer of land is held in equity to know the rights of all persons in possession or occupancy thereof, as fully as he could learn them by inquiry of such persons, and that this applies in favor of the mechanic building any structure thereon at the time of such purchase or incumbrance, we are unable to see how this will aid them. Assuming appellant did not see appellees at work on the premises in erecting this house, and made inquiry of them as to all that it is claimed he should have done, what would have been the result? He would simply have learned that they had been for the past thirty or forty days trespassing upon the property of Long, from which act they did not acquire any right of lien upon the lots. He would further have learned that at that time Machen owed them nothing on the house, and that, by the mistake in locating the house, the agreement between them and Machen was at an end, and that, if they should ever go on and finish the house, it would be under a new and different agreement from that made March 15th. Certainly, this was the situation at that time, and a knowledge of it would not have prejudiced appellant, nor made it inequitable in him to take a lien on these lots.

The person in possession must have some rights in or

to the premises which the law will recognize and enforce, the knowledge of which the intending purchaser or incumbrancer can obtain by inquiry. But it never was held that a knowledge of or notice to such person that the occupant might by agreement with the owner of the land acquire some lien thereon or some rights therein, in the future, would bind him to respect such after-acquired rights in case he should purchase the land. And this is precisely the rule now contended for by appellees upon this point.

When appellant advanced his money, and took his security on the lots, he knew, say appellees, all he could have learned by inquiry of them, as to their relations with Machen, and their rights in and to these lots 7 and 8, which, as has been shown, were nothing; but by inference, they say, he also must have known that, after Machen should acquire the title to the lots from Long, he would then enter into an agreement with appellees for the completion of the house, or permit appellees to proceed to build the house, without any express agreement. This is the plain meaning of appellees. But if this all be admitted, it comes to nothing more than notice to appellant that, after his lien should be created, his grantor would or might create other liens upon the estate. Would the case be different if, instead of this asserted lien being a mechanic's lien, it was that of a second or third mortgagee? Clearly not under the statute. And will it be seriously contended that, in the case supposed, the knowledge of appellant that Machen intended to put a second or third mortgage upon the premises would have prejudiced his priority as against all subsequent incumbrances? It follows necessarily from these considerations that appellees can have no priority over appellant, by reason of any supposed knowledge he may have had of the future intentions of Machen and appellees, for the completion of the unfinished house.

Next, it is insisted that, as appellant knew of the

prosecution of work on the house, and the completion of the same, after the execution of his trust deed, and did not object to it, he is now bound to postpone his security to the lien of appellees. To this there are two answers: *First*, there is in the record no evidence that appellant had any knowledge or notice of the work going on upon the house at any time before he was made party to this suit; and, *second*, if he did, he would not have been affected by such knowledge. It certainly is not the law that a mortgagee shall give actual notice to the world of his incumbrance. He is required to record it, and when he has so done he may rest in perfect security as to any further liens which the mortgagor may see fit to create on the property.

Mr. Phillips, in his book on Mechanics' Liens, says, at section 232: "The lien of the mechanic in such case, for work or labor done upon mortgaged property at the instance of the mortgagor, is subordinate to that of the mortgagee, although the latter knew of such work and labor at the time the mechanic rendered the same, and did not object." *Card v. Bank*, 23 Conn. 355; *Hoover v. Wheeler*, 23 Miss. 314; *Pride v. Viles*, 3 Sneed, 125.

So far from its being appellant's duty in this case to have notified appellees of his rights in the premises, it was their duty, before doing work under the new contract, to have consulted the record, and to have made inquiry of him as to any facts which the record failed to disclose. Again, referring to Phillips in the same section, we find the rule upon this point stated thus: "The rule of *caveat emptor*, therefore, applies against a mechanic as well as in the case of a vendee. If a contractor proposes erecting a building, and furnishing materials or putting labor on a lot of ground, it behooves him to examine and assure himself of the fact that the person with whom he contemplates making his contract, or for whose benefit he is about to employ means or labor, has such an interest or title unincumbered as will enable him

to avail himself of a valid or efficient lien. Under the
system of registration in this country, a little diligence
will always impart to a person the requisite information:
and if he fails to inform himself, the law will not relieve
him against the consequences of his own negligence."
*Brigwell v. Clark*, 39 Mo. 170.

As a further reason why appellant should be postponed
to appellees, it is contended that, since appellees can
maintain a lien on lots 7 and 8 as against Machen, they
can also maintain it as against appellant, because he
stood in privity with Machen when he advanced his
money for the security of which he took the trust deed,
and is thereby affected by the same fact and knowledge
as would affect Machen, and to the same extent. As
has already been said, there is no proof of such knowl-
edge on the part of appellant, and the conclusion of
appellees that he had such knowledge is to be deduced
alone from the doctrine of privity. But vendor and
vendee, mortgagor and mortgagee, deal at arm's length.
Between them there is no such relation as gives rise to
this doctrine and its consequences. Under the rule here
contended for by counsel for appellees, there could be no
such person as an innocent purchaser of land, where
there was any wrong in the sale upon the part of the
vendor; and the impregnable defense in courts of equity
of a *bona fide* purchase for value, without notice of
defects of title, could have no existence. The case fails
to disclose any fact which can justify the postponement
of appellant's rights to those of appellees as to lots
7 and 8.

The last point relied on by appellees to support the de-
cree herein is that, though they may be unable to main-
tain a lien on the lots as against appellant, they can
against the house under the provisions of the act referred
to, by force of the clause, "and a lien on such structure
where the other has no ownership, interest, tenancy or
claim of, in or to such land." It is impossible to accept

this application of the clause in question, assuming it to be constitutional, for the obvious reason that Machen was not in the predicament pointed out therein. He was not within its terms or meaning. He was not, when the new contract was made, and the work thereunder commenced, to wit, after May 6, 1882, a person without ownership, interest or claim of, in or to the land, but was the equitable owner of the same, and as such was entitled to the possession thereof, with the right to improve it, and did not hold the house as something distinct from the land, but owned it by virtue of his ownership of and title to the land; so that both it and the lots constituted but one article of property, which was real estate. Upon Machen's title there is no doubt that appellees were entitled to a lien; but in the enforcement thereof they could occupy no better situation than that of their debtor, as against the appellant. They could sell no greater estate than Machen had when their lien attached. That estate, as we have seen, was subject to an incumbrance in the hands of appellant, and it cannot be denied that, if appellees had foreclosed their lien before the foreclosure of the trust deed of appellant, the purchaser at such foreclosure sale would have bought the property subject to the trust deed, and under the liability to have been sold out under the same.

The title of Machen to the land, carrying with it all that is considered and held to be land, necessarily gave him title to the house, as part thereof, so that in law there was no structure within the meaning of the statute referred to, distinct from the land, upon which a lien could take effect. Assuming for the purposes of this case that the last clause of the section was intended to apply where the land referred to therein is owned by a third person in fee, we do not feel like extending the provision by saying that the peculiar lien mentioned therein was intended to be given in a case where the owner of the building has an interest of any kind in the

realty.   The statute nowhere, even by implication, repeals the common-law right of the mortgagee of real estate to subject all improvements made thereon by the owner or mortgagor, subsequently to his incumbrance, to the payment of his demand; but, on the contrary, recognizes and expressly postpones this statutory lien to all prior liens and incumbrances of which the mechanic or material-man had actual or constructive notice at the commencement of his work or the furnishing of the materials.   It follows necessarily from these conclusions that the county court erred in decreeing that appellant should hold his title to the premises in question subject to the lien of appellees, and in the directions given for the enforcement of such lien, and that so far the decree must be reversed.

The decree should be reversed and the bill dismissed as to the appellant.

I concur: Macon, C.

I dissent: Stallcup, C.

By the Court.   For the reasons assigned in the foregoing opinion of the majority of the supreme court commissioners, the judgment of the county court is reversed and the cause remanded, with directions to dismiss the complaint as to the appellant.

*Reversed.*